JONES, Appellant, vs. WISCONSIN MICHIGAN POWER COMPANY, Respondent.*

*February 17—March 29, 1948.*

* Motion for rehearing denied, with $25 costs, on May 25, 1948.

For the appellant there were briefs by *Krueger & Plier* of Oconto, and oral argument by *James H. Plier* and *Harold W. Krueger*.

For the respondent there was a brief by *Shaw, Muskat & Paulsen* of Milwaukee, and *Homer H. Benton* of Appleton, and oral argument by *Mr. Benton* and *Mr. Carl Muskat*.

WICKHEM, J.   In this action plaintiff charges (1) that defendant negligently reduced the level of the water of a mill-pond on the shore of which the city of Oconto Falls maintains a municipal beach; (2) that as a result of this he dove into shallow water injuring his spine and causing a general and permanent paralysis.

Defendant contends that it owed no duty to plaintiff; that it was not guilty of conduct falling below standards of ordinary care and that in any case, the trial court correctly concluded that any negligence attributable to it was not a cause of

plaintiff's injuries. The nature of the contentions requires a statement of the facts in some detail.

The Oconto river is navigable and flows through the city of Oconto Falls. In 1939 defendant bought a hydroelectric dam at Oconto Falls, the operation of which forms a millpond or artificial lake. The dam backs up the water for about eight miles and the height of the dam regulates the quantity and the height of the water in the pond. On the east side of this pond and about one-eighth mile upstream from the dam is a bathing beach owned by the city of Oconto Falls. The public has used this for bathing purposes for about forty years. At this beach a raft twenty-five feet, nine inches long and twelve feet wide was constructed and anchored about seventy-five feet out in the millpond by a steel cable attached to an anchor. The raft could turn a full three hundred sixty degrees. Upon the raft a diving board was constructed which extended for ten feet, four and one-half inches over the edge of the raft. The steel cable was about twenty feet in length and was anchored in about twenty-one feet of water and when anchored in water of such depth could not otherwise change its location. As the raft turned with the shifting of the winds the diving board would turn with it but the water was deep enough to be within safe limits for diving no matter which way the board turned.

Briefly, it is charged that defendant without notice, for the purpose of making repairs and changes upon the dam, dropped the level of the water about four feet; that this gave the cable about four feet of slack and made it capable of moving some twelve feet from its anchored location; that this, together with the reducing of the water level, made it possible for the diving board to be so located in case of an inshore wind as to cause divers to jump into four feet of water. On the date of the accident plaintiff went out to the raft, made two or three dives while the wind was offshore and then rested for some time. Before he took his last dive the wind had shifted to an inshore wind, plaintiff dove and struck his head causing the injuries.

There is evidence that when he ended his dive about ten inches of his legs and feet were out of the water indicating a depth of about four feet; that he had sand in his mouth and hair indicating contact with the bottom. There was evidence that a person may also sustain the same injuries by diving so inexpertly as to put a strain upon the vertebrae of the neck. There is evidence of daily readings of water levels by the company and testimony of those in charge of the dam that the water was not lowered more than about nine inches but there was conflicting evidence and the jury was entitled to believe that the level was reduced to the extent that plaintiff claims.

Defendant argues that records as to measurements of water level must be treated as verities because made in the regular course of business prior to this controversy but we cannot agree to this. There is also the assertion that estimates must yield to actual measurements but this principle has no bearing here. There is evidence here that plaintiff dove and hit bottom at a spot where the water was not more than four feet deep; that the cable had neither slipped nor had the anchor moved; that the anchor was in twenty feet of water and that if the water level was maintained the raft could not be so driven by the wind as to put shallow water within reach of a diver; that a person who was building a boathouse was able to get down about four feet further than usual to do his stonework; that the water at the beach had receded some sixteen or eighteen feet. There was an issue for the jury whether the waters had been so reduced as to render the diving board unsafe for swimmers.

Since the jury has resolved this much of the question we are squarely faced with the need to determine what duty, if any, defendant owed to plaintiff. *Palmer v. Janesville Improvement Co.* 195 Wis. 607, 219 N. W. 437. Plaintiff seeks to establish the fact that reduction of the water level in the millpond in this instance was unlawful because under ch. 31, Stats., defendant was required to obtain an order from the public

service commission before making this alteration to its dam. Sec. 31.18 (3), Stats., provides that except in cases of emergency "no substantial alteration or addition shall be made to any dam . . . without obtaining an order therefor from the commission," and that this order can be issued only upon a finding that the alteration will not impair the sufficiency of the dam. It is further asserted that under sec. 31.06 (1) and (2) there should have been a hearing before the commission preceded by a notice to such persons as might be affected.

We are of the view that these sections have no application to the facts. The substitution of cement for wooden flashboards was simply a part of the proper maintenance of the dam specifically required by sec. 31.18 (1), Stats. It did not constitute a substantial alteration or addition to the dam and in any case sec. 31.06 (1), relating to a hearing, is clearly applicable to petitions for the erection of a dam. The permit of the public service commission under which the dam was originally built, as well as subsequent applicable orders, established a maximum height but no minimum level at which the water in the millpond must be maintained. The released water which lowered the dam in this instance was run through the plant and utilized for power. We conclude that defendant had a right to lower the level of the pond in the course of its ordinary operations and that since (1) the reduction here involved was occasioned by routine repairs in accordance with defendant's duty to keep its dam in condition, and (2) the water drawn off the pond was utilized for the production of power, the entire operation constituted a usual and normal operation of defendant's plant.

Since defendant was doing what it had a right to do the question is whether it owed some duty of warning or notification in order that those using the millpond would not risk injury in its use.

We are of the view that defendant had no such duty and that to impose one would create intolerable difficulties in the operation of the power plant. The production of power is of such

social importance that a duty of such magnitude cannot fairly be imposed. The millpond extended back for about eight miles or at least affected water for that distance. The numbers of notices that would have to be given upon each such change in water levels would be quite overwhelming. Defendant in the exercise of its undoubted legal right to use the pond for the purposes for which it was created would be faced with the necessity of foreseeing each of the likely consequences that a perfectly normal use of the millpond might have and to reach the persons affected by these consequences with adequate notice of the pendency of the operations. It is difficult to see how such a duty could be discharged in practice, having in mind the numerous uses of the pond by others; and the fact that the pond was capable of use by strangers and tourists; that its shores are owned by private owners and that defendant had no right to post the shores and could not do so without trespass.

This was quite an extraordinary accident. Others may easily be imagined and the ramifications of the duty would unduly burden the useful operations of the power company. It is more rational, we think, that users of the millpond be charged with knowledge that it will be utilized for the ordinary business purposes of producing power and that these will affect the water levels. This was a pond created to the knowledge of everybody for the purpose of furnishing reserves of water to be utilized in defendant's dam and it must be apparent to such users that changes in water level will be the normal consequence of its use. Further than this, a reduction of four feet in the millpond could not be made and was not made without carrying a substantial physical notice of its accomplishment to those who used it for swimming, boating, and other purposes. It is the testimony that the beach showed a recession of fifteen to eighteen feet and a person using the raft could tell by the shallowness of the water as he waded out in its direction that the water was low in the vicinity of the shore and no

one could use the raft and the diving board after it had drifted toward the shore, and the diving board was pointed toward shore without being aware that he was diving into the very water through which he had waded to get to the raft.

This is a case that makes a strong appeal to our sympathies and we have given the matter most conscientious and careful attention but are unable to discover that defendant had or breached any duty to plaintiff. It follows that the matter was correctly disposed of in the trial court.

*By the Court.*—Judgment affirmed.